Filed 8/11/26  P. v. Mendoza CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H052314 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C2203165) |
| v. | |
| AUDENCIO ROSAS MENDOZA, | |
| Defendant and Appellant. | |

Audencio Rosas Mendoza was convicted by jury of forcible lewd acts on a child under 14 and annoying and molesting a child under 18.  On appeal, he contends that the trial court prejudicially erred by limiting the scope of the defense case and argument, admitting expert testimony on the child sexual abuse accommodation syndrome (CSAAS), misinstructing the jury on the permissible use of CSAAS evidence, and permitting rebuttal evidence to discredit his character for honesty.  Rosas Mendoza further contends that the prosecutor engaged in misconduct by expressing her personal belief in his guilt and that insufficient evidence supports his convictions for counts 2 and 3.  Finding no prejudicial error, we will affirm.

## I.    BACKGROUND

The Santa Clara County District Attorney charged Rosas Mendoza with three counts of lewd or lascivious acts on a child under 14 by force, violence, duress, menace,

and fear (Pen. Code, § 288, subd. (b)(1); counts 1–3),[1] and two misdemeanor counts of annoying or molesting a child under 18 (§ 647.6, subd. (a)(1); counts 4–5). The victim of counts 1 through 3 was identified as B. Doe, then 13 years old; the alleged victim of counts 4 through 5 was identified as B. Doe's older sister, A. Doe, then 16 years old. The prosecution further alleged two prior strike convictions (§ 1170.12, subd. (b)(1)) and one circumstance in aggravation (Cal. Rules of Court, rule 4.421(b)(2) [prior convictions are "numerous or of increasing seriousness"]).

## A. *Trial Evidence*

The charged offenses took place over a few days in March 2022. At that time, A. Doe and B. Doe lived in a three-bedroom home with their mother, siblings, aunt, and their aunt's children. About two months before the charged incidents, Rosas Mendoza moved in. He was their uncle, and both girls enjoyed a good relationship with him. Rosas Mendoza initially stayed in the garage but later moved into one of the bedrooms.

A. Doe and B. Doe occupied a portion of the living room with their mother and siblings. Two mattresses were set up on the floor and a curtain was hung for privacy. A. Doe and B. Doe shared one mattress, and their mother, brother, and sister shared the other. The girls' other brothers either slept on the living room floor or in the bedroom with their aunt's children.

### 1. *Counts 4 and 5 (A. Doe)*

On March 11, 2022, a Friday morning, A. Doe was lying on one of the mattresses with her two youngest siblings when she felt Rosas Mendoza get in bed with her and repeatedly tell her to wake up. He pressed the front of his body against the back of hers and placed his left leg on top of her legs. A. Doe felt his "hard" penis pressed against her butt as he moved his body "up and down." Mendoza also rubbed his hand against her hip and thigh, saying, "Oh my gosh. You're so pretty." The incident made A. Doe feel

---

[1] Undesignated statutory references are to the Penal Code.

uncomfortable, and she told Rosas Mendoza to leave her alone. Rosas Mendoza eventually replied, "Oh my God" and walked out. At first, A. Doe told no one about the incident because she felt scared that her family might think poorly of her.

Over the weekend, after getting angry with Rosas Mendoza for making disrespectful comments about her mother, A. Doe was lying on her mattress with B. Doe when Rosas Mendoza "threw himself" onto the bed on top of her. He apologized for his comments and complimented both sisters on their appearance, "talking about … [their] bodies" and saying they were pretty while repeatedly touching A. Doe's face and hair. At some point, Rosas Mendoza positioned himself between the two sisters and put his hand on the bare skin of A. Doe's abdomen. He then moved his hand down to her hip and thigh, continuing to compliment her. A. Doe threw Rosas Mendoza's hand away from her, only to have it land on her sister's thigh. Rosas Mendoza then moved his hand "up to [B. Doe's] inner thigh" and "rub[bed]" it, causing B. Doe to jump off the bed.[2]

While B. Doe was in the adjacent kitchen, A. Doe urged her by text to get Rosas Mendoza to leave. In one message, A. Doe wrote: "He keeps complimenting and touching me." A. Doe also texted her then-boyfriend, M.O., that she was "disgusted" and "hella uncomfortable" because her uncle was "[r]ubbing [her]" inappropriately despite her asking him to leave her alone. Rosas Mendoza also told both girls he would date them if they were not his nieces. He compared A. Doe's body to his wife's and told B. Doe that she "better not have any … boyfriends because she was his."

### 2.    *Counts 1 – 3 (B. Doe)*

That same weekend, the girls' family went to a party, but B. Doe stayed home in bed because she felt unwell. B. Doe was trying to sleep when Rosas Mendoza came into the room. Telling B. Doe that "he wouldn't do anything to hurt [her]," he lay next to her

---

[2] Though there was evidence that Rosas Mendoza touched B. Doe's thigh on this occasion, the prosecution elected to rely solely on the events of the following evening—when B. Doe stayed home without her family—as the basis for counts 1 through 3.

on the mattress.  Feeling uncomfortable and "weird," B. Doe at one point retreated to the bathroom down the hall, where she FaceTimed her best friend, A.T., and stayed for approximately 30 minutes, hoping that Rosas Mendoza would go away.

When B. Doe came out of the bathroom, Rosas Mendoza was standing in the hallway.  He hugged her tightly enough that she could not move.  He followed her into the living room, then "hugged her 'til [she] laid down on the bed."  Confused, B. Doe pushed Rosas Mendoza off her and moved to the other mattress.  But Rosas Mendoza followed, "got on top of [her]," and kissed her neck.  He "kind of squeezed" her neck and whispered, breathing heavily, that he loved her.  He then slid his hand from her neck to her breast.  Rosas Mendoza also put his hand on her thigh and moved his hand from "side to side."  He told B. Doe that "[her] mom didn't have to know."

During the incident, B. Doe separately texted her sister and A.T.  B. Doe asked A. Doe to come home and, when A. Doe asked if B. Doe was scared, B. Doe said she was.  In her text messages to A.T., B. Doe said that her uncle had "touched her in a weird place."

### 3.     *Disclosure of the Abuse*

Within a few days, A. Doe and B. Doe told their mother about Rosas Mendoza's conduct.  Neither sister planned to report the incidents to police:  They were concerned it would cause problems with other family members.  But two days after they told their mother, Rosas Mendoza threatened to set the house on fire with everyone in it, and the police were called.  One of the girls' siblings told an officer investigating the arson threat that there had also been a "sexual assault incident" involving A. Doe and B. Doe., and Rosas Mendoza was arrested and charged.[3]

---

[3] After being arraigned on the charges, Rosas Mendoza was "mistakenly released," and a bench warrant issued for his arrest in May 2022.

4

### 4. *CSAAS Testimony*

Over defense objection, clinical psychologist Blake Carmichael, Ph.D., testified for the prosecution as an expert on Child Sexual Abuse Accommodation Syndrome (CSAAS). Before Carmichael testified and again before closing arguments, the trial court instructed the jury on CALCRIM No. 1193, as follows: "[CSAAS] relates to a pattern of behavior that may be present in child sexual abuse cases. Testimony as to the accommodation syndrome is offered only to explain certain behaviors of an alleged victim of child sexual abuse. [¶] Dr. Blake Carmichael's testimony about [CSAAS] is not evidence that the defendant committed any of the crimes charged against him. You may consider this evidence only in deciding whether or not [A. Doe's] and/or [B. Doe's] conduct was not inconsistent with the conduct of someone who has been molested and in evaluating the believability of their testimony."

At the outset of his testimony, Carmichael clarified that he had not reviewed police reports or interviewed people involved in the case. He explained that CSAAS is not a diagnostic tool, that he "can't say" based on CSAAS evidence whether a specific child had been sexually abused, and that that determination was for the jury. Carmichael provided testimony on several components of CSAAS: (1) secrecy, (2) helplessness, (3) entrapment and accommodation, and (4) delayed, conflicted, and unconvincing disclosure.

Carmichael testified that even in the absence of overt threats, sexually abused children may not timely disclose their experience of abuse for fear that others will "view them differently, disparage them, [or] get angry at them for being a troublemaker." Carmichael opined that particularly when the abuser has a close relationship with the children or holds a position of power, "[w]e don't see a lot of kids biting, kicking, screaming, or somehow calling attention to what's going on, even with other people … next door or in the same room," due to the "power dynamic just from the size and age." When sexually abused children do disclose the abuse, the disclosure may be delayed or

5

incomplete: The children "may share different details with different people" or decline to share certain details altogether because they are uncomfortable talking about the subject. Finally, Carmichael explained that when sexually abused children disclose abuse, their disclosure may sound unconvincing to others because children have more trouble recounting "abstract" details such as time, sequence, and duration, and that those details are things that "a kid could mess up and get wrong."

**B.** *Defense Case*

The defense's theory of the case was that Rosas Mendoza lacked any lewd purpose or intent in his conduct with his nieces, and that any physical contact or compliments were merely part of his effort to "build up his niece[s]" and "be supportive." The defense maintained that A. Doe and B. Doe misinterpreted a "normal family situation" and that their subjective understanding was immaterial to Rosas Mendoza's state of mind.

**1.** *Character Witnesses*

Rosas Mendoza's sister, Bertha R., testified that she has known Rosas Mendoza all her life and that he had lived with her for several years in the 1990's and again between 2000 and 2007, when all four of her children were minors. She opined that he behaved appropriately with children, and she trusted him with hers.

Alicia V. is Rosas Mendoza's 21-year-old niece and has known him her whole life. Rosas Mendoza lived with her family when she was five years old, and again "for a couple months" in 2022. She had observed Rosas Mendoza around children ranging from infants to teens and opined that he behaved appropriately around them. Alicia V. acknowledged that Rosas Mendoza had previously told her she is beautiful, but denied he commented on her body. She maintained his comments have always been appropriate.

**2.** *Rosas Mendoza's Testimony*

Rosas Mendoza moved into the house after his wife kicked him out of their home for using drugs. He initially lived in the garage but later moved into one of the bedrooms

6

after his sister's son moved out. Rosas Mendoza consumed alcohol and used methamphetamine while living there.

While at the house, Rosas Mendoza went into the living room for two purposes: to get food from the refrigerator or to play video games with his nephew. He denied ever going into the living room to visit his nieces and volunteered that would be "kind of weird." Rosas Mendoza denied ever lying in bed with A. Doe or B. Doe except once with A. Doe while they waited for his nephew to join them to play video games. Rosas Mendoza admitted having complimented A. Doe on her appearance but said he only did so because she was being bullied by her brother.

Rosas Mendoza recalled encountering B. Doe the day she stayed home from the party. He had been drinking and using drugs all day and was doing construction work in the kitchen. He saw B. Doe come out of the bathroom, talking on the phone and looking "kind of upset, kind of sad." So he "gave her a hug and then she walked off." He hugged and kissed "everybody," but not on the neck because "[t]hat's kind of weird."

Rosas Mendoza claimed A. Doe called the police because they argued after she found out he was cheating on his wife. He denied threatening to burn down the house: In his view, A. Doe overheard him merely describing a dream he had, which she then "exaggerated." Rosas Mendoza admitted having been convicted of multiple crimes of moral turpitude, including a hit and run in 2018 and a first degree burglary in 2010, and to having multiple open cases. He denied inappropriately touching A. Doe or B. Doe or harboring sexual intent toward them. He considers himself an honest person and would not lie to police.

## C. *Rebuttal Evidence*

San Jose Police Officer Jaime Arredondo testified as the prosecution's sole rebuttal witness. In August 2023, Arredondo stopped Rosas Mendoza's bicycle during a routine traffic stop. Rosas Mendoza provided Arredondo with a false name and date of

7

birth and falsely told Arrendondo he had never been arrested.[4] When Arredondo attempted to identify Rosas Mendoza by his tattoos, Rosas Mendoza misrepresented what the tattoos said. Arredondo was eventually able to identify Rosas Mendoza and determined that the tattoo on Rosas Mendoza's neck said, "thug life," and the tattoo on his knuckles said, "evil life" (not "Cali thug" and "east side San Jose life," as Rosas Mendoza had claimed). A search of Rosas Mendoza's backpack revealed social security cards, driver's licenses, and credit cards belonging to four individuals.

During closing argument, the prosecutor reminded the jury that Rosas Mendoza repeatedly lied to Arredondo during the traffic stop and urged the jury to use this evidence to evaluate his credibility.

### D.   *Verdict, Trial on Priors and Aggravating Factor, and Sentencing*

The jury found Rosas Mendoza guilty of the charged offenses and in a bifurcated trial found true the two alleged strike priors and the circumstance in aggravation. At sentencing, the trial court declined Rosas Mendoza's invitation to dismiss the strike allegations (§ 1385; *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497) and sentenced him to 75 years to life, calculated by imposing three consecutive terms of 25 to life for counts 1 through 3 and a concurrent term of 30 days for counts 4 and 5.

Rosas Mendoza timely appealed from the judgment.

## II.   DISCUSSION

On appeal, Rosas Mendoza contends that the trial court prejudicially limited the defense's case and closing argument and improperly admitted certain prosecution evidence in violation of Evidence Code section 352. He also contends that the court improperly admitted CSAAS testimony and compounded the error by instructing the jury on CALCRIM No. 1193. Finally, Rosas Mendoza argues that the prosecutor engaged in

---

[4] At the time, Rosas Mendoza had an outstanding warrant in this case and had been at large for more than a year.

8

prejudicial misconduct by expressing her personal opinion regarding his guilt during cross-examination, and that insufficient evidence supports his convictions for counts 2 and 3.

## A. *Limitations on Defense Case and Argument*

Rosas Mendoza contends the trial court improperly limited the presentation of his case by (1) barring him from recounting prior statements by A. Doe and her brother suggesting that A. Doe was being bullied; (2) limiting the number of character witnesses he was permitted to call; and (3) precluding defense counsel from discussing the different burdens of proof in closing argument.

We review each of these rulings for abuse of discretion. (See *People v. Helzer* (2024) 15 Cal.5th 622, 667 [standard for reviewing admission or exclusion of evidence]; *People v. Waidla* (2000) 22 Cal.4th 690, 724 [standard for reviewing admission of evidence under Evid. Code, § 352]; *People v. Simon* (2016) 1 Cal.5th 98, 147 (*Simon*) [standard for reviewing trial court's decision to limit defense counsel's closing argument].)

### 1. *Prior Statements About Bullying of A. Doe*

During Rosas Mendoza's testimony, he attempted to recount prior statements by A. Doe and her brother to show that A. Doe was being bullied. The trial court sustained the prosecutor's hearsay objection. Rosas Mendoza contends that the statements were offered not for their truth but for the nonhearsay purpose of their effect on Rosas Mendoza—to explain why he would compliment A. Doe on her appearance. (*People v. Scalzi* (1981) 126 Cal.App.3d 901, 907.) "Evidence of an out-of-court statement may be admitted for the nonhearsay purpose of showing its effect on the listener so long as that effect is relevant to an issue in dispute." (*People v. Ramirez* (2022) 13 Cal.5th 997, 1115.) We agree with Rosas Mendoza that the challenged statements were relevant to support Rosas Mendoza's theory that he commented on A. Doe's appearance to "[m]ake her feel better" in the aftermath of her brother's bullying. The statements were also

9

"relevant to an issue in dispute" (*Ramirez*, at p. 1115) by tending to negate the element of sexual intent.

But despite the trial court's error in excluding the statements, it is "not reasonably probable that the error affected the outcome of the trial." (*People v. Harris* (2005) 37 Cal.4th 310, 336 (*Harris*) [explaining that the "application of ordinary rules of evidence" are reviewed under the " 'reasonable probability' standard of *People v. Watson* (1956) 46 Cal.2d 818, 836"].) Rosas Mendoza argues "there is a reasonable chance at least one juror could have had a reasonable doubt as to appellant's guilt had the court not excluded appellant's testimony regarding [A. Doe's] statements to him about the bullying." But though the trial court barred Rosas Mendoza from recounting the specifics of the statements, it permitted him to testify in detail about the incidents of bullying and to explain to the jury both the context and impetus for his comments. For example, Rosas Mendoza was permitted to tell the jury that (1) the reason he told A. Doe she looked beautiful was that "she was being bullied by her brother"; (2) his goal in making the comment was to "[m]ake her feel better"; and (3) he felt his comment on her appearance was permissible because he did not "feel [sexual] toward her."[5] Conversely, the evidence against Rosas Mendoza was strong, given the fresh complaint evidence, which included the testimony of the mother and brother of A. and B. Doe, A. Doe's then-boyfriend, and B. Doe's best friend, and screen shots of text messages contemporaneously reporting the abuse.

Because Rosas Mendoza had an opportunity to explain to the jury why he complimented A. Doe on her appearance, and because there was additional evidence to corroborate the girls' account of the charged incidents, it is not "reasonably probable"

---

[5] And Rosas Mendoza did have the opportunity to recount at least some of the statements without objection later in his testimony, when he reiterated to the jury that the only time he ever complimented A. Doe on her appearance was when "her brother was bullying her, *telling her that she looked awful, she looked like a boy*." (Italics added.)

10

that he would have obtained a more favorable result in the absence of the trial court's evidentiary error. (*Harris*, *supra*, 37 Cal.4th at p. 336.)

### 2. *Limitation on Number of Character Witnesses*

Rosas Mendoza next contends the trial court improperly limited the number of character witnesses he was permitted to call at trial. At the start of the defense's case, counsel indicated outside the jury's presence that he intended to call six character witnesses. When the prosecutor sought to limit this number under Evidence Code section 352, counsel replied, "[f]or the … six character witnesses, I think each sort of address a different period of time with him. So I don't think its cumulative or inappropriate." The court limited the number of character witnesses to two, and Rosas Mendoza called his sister, Bertha R., and niece, Alicia V. We discern no abuse of discretion in the trial court's limitation on the number of Rosas Mendoza's character witnesses.

Defendants have a fundamental right to call witnesses in their defense. (See *People v. Cudjo* (1993) 6 Cal.4th 585, 638.) And Evidence Code section 1102, subdivision (a) permits a defendant to offer evidence of his own character "to prove his conduct in conformity with such character or trait of character." But the defendant's right to call character witnesses remains subject to the trial court's authority to regulate the admission of evidence, including the court's authority to exclude evidence "if its probative value is substantially outweighed by the probability that its admission will … necessitate undue consumption of time." (See Evid. Code, § 352; *People v. Jones* (1998) 17 Cal.4th 279, 305 [" 'Courts retain … a traditional and intrinsic power to exercise discretion to control the admission of evidence in the interests of orderly procedure and the avoidance of prejudice' "]; *People v. Brown* (2003) 31 Cal.4th 518, 576 ["Evidence Code section 352 permits the exclusion of evidence on the ground that it is cumulative"].)

Here, both Bertha R. and Alicia V. testified to having known Rosas Mendoza all their lives and having observed him around children of all ages. Both opined he behaved

11

appropriately around children. While Bertha R.'s testimony focused primarily on Rosa Mendoza's conduct between 2000 and 2007, Alicia V. formed her opinions more recently, based in part on Rosas Mendoza having lived with her family in 2022—the year the charged conduct took place. Nothing in the record suggests that any excluded character testimony materially differed from that presented: The defense offer of proof was merely that each witness would "address a different period of time," not a different character trait or different basis for their opinion. Mendoza argues the trial court should have admitted additional character witness testimony because "[t]he jury could have reasonably questioned whether [Rosas Mendoza's] character has changed over time." But given the apparently indistinguishable quality of the testimony and foundations for the witnesses' opinions, it was not unreasonable for the court to implicitly determine that its limitation still permitted the testimony of two witnesses who, taken together, would effectively bookend a period of decades. And that this in turn invited the inference that Rosas Mendoza's conduct with children in the presence of their family remained consistent throughout.

The trial court thus did not abuse its discretion in limiting Rosas Mendoza's presentation of character witnesses under Evidence Code section 352.

### 3. *Precluding Counsel from Discussing Standards of Proof Other Than Beyond a Reasonable Doubt*

Finally, Rosas Mendoza argues the trial court impermissibly barred defense counsel from discussing the different standards of proof during closing argument. Before trial, the court granted the prosecution's in limine motion to preclude the use of "reasonable doubt chart[s]" that "address[] [any] other standards of proof" by "tell[ing] [the jury] what the other burdens are." The court reasoned, "That was resolved" in "a published case" that deemed such charts "not relevant."

Defense counsel revisited this issue after the prosecutor used preliminary hearing transcripts to refresh the recollection of several witnesses. Counsel argued that he should

12

be able to explain to the jury that a different standard of proof was used during the preliminary hearing, and that standard is lower than the applicable standard at trial. The court denied the request, reasoning that the mere mention of the preliminary hearing alone did not warrant reconsideration of its earlier ruling.

A trial court has "broad discretion to control the duration and scope of closing arguments" (*Simon*, *supra*, 1 Cal.5th at p. 147), and to limit the scope of arguments to "relevant and material matters" (§ 1044; see also *People v. Edwards* (2013) 57 Cal.4th 658, 743). The exercise of discretion, however, must be tethered to a correct understanding of the applicable law. (*Perez v. Torres-Hernandez* (2016) 1 Cal.App.5th 389, 396–397 [" ' "a discretionary order based on an application of improper criteria or incorrect legal assumptions is not an exercise of informed discretion and is subject to reversal" ' "].) We know of no appellate decision that categorically prohibits argument that proof beyond a reasonable doubt is a more exacting standard than others or that makes such argument "not relevant"—whether expressed orally or in a visual aid. Nor have the People supplied any, either in the trial court or on appeal.[6] A trial court abuses its broad discretion if it bases its ruling on a misunderstanding of law and not on any

---

[6] Although the prosecutor at trial cited *People v. Centeno* (2014) 60 Cal.4th 659 and *People v. Otero* (2012) 210 Cal.App.4th 865 as authority for her assertion that "[a]ny use of diagrams, puzzles, verbal analogies to other burdens of proof is improper," this was a reductive misreading of the cited cases. Both *Centeno* and *Otero* addressed prosecutorial misconduct, not the parameters of defense closing argument. (*Centeno*, at p. 666; *Otero*, at p. 873.) In each case, the visual representation used by the prosecutor was improper not because the argument was irrelevant or because charts were categorically improper but because the particular visual aids used were misleading. (*Centeno*, at p. 669 [reversing based on prosecutorial error where the "types of [iconic] images" used by the prosecutor "trivialize the deliberative process, essentially turning it into a game that encourages the jurors to guess or jump to a conclusion"]; *Otero*, at pp. 872–873, fn. omitted [holding that "the prosecutor committed misconduct" by using a visual exhibit that misleadingly "demeaned" the reasonable doubt standard].)

13

identifiable feature of the contemplated argument or exhibit.[7] (*Perez v. Torres-Hernandez*, at pp. 396–397.)

The record here does not, however, show that the trial court's ruling was prejudicial. Although the prosecutor used the preliminary hearing transcripts to refresh witnesses' recollection at trial, there was no evidence of the preliminary hearing's purpose, nor what standard of proof applied at that stage. Nor was the jury called to apply other standards of proof such as probable cause or preponderance of the evidence: In limine, the prosecutor agreed to forgo any discussion of the preponderance of the evidence standard for proof of prior acts, specifically to "avoid[] the problem of juror confusion on … two different burdens of proof." Rosas Mendoza argues "it is possible that the jury may have struggled with the standard of proof, a difficult legal concept." But "[w]e presume that jurors are intelligent and capable of correctly understanding, correlating, applying, and following the court's instructions." (*People v. Acosta* (2014) 226 Cal.App.4th 108, 119.) And nothing in the record suggests that this presumption is unwarranted here, when the jury was correctly instructed on the standard of proof beyond a reasonable doubt and the presumption of innocence. Moreover, although he was not permitted to relate to the jury different standards of proof that apply in different legal contexts, defense counsel in closing argument was able to compare the concept of reasonable doubt to less exacting standards: "Not maybe. Not probably. Not likely …. Beyond a reasonable doubt [is] an abiding conviction … something that stays with you …. A fixed belief …. Religion, politics, whatever it may be."

---

[7] To the extent that the defense wished to use a chart, that chart is not in our record, apparently because none was presented before the trial court when it granted the prosecution's preemptive motion in limine to preclude *any* "reasonable doubt chart" or when the defense sought reconsideration of that ruling. We express no opinion on the propriety of a hypothetical chart. We merely question the propriety of deeming a chart "not relevant" sight unseen, based on misconstrued authority.

In sum, assuming the trial court erred by precluding defense counsel from visually comparing the standard of proof beyond a reasonable doubt to less rigorous standards of proof that apply in other contexts, it is not reasonably probable that Rosas Mendoza would have obtained a better outcome but for his inability to discuss the standard of proof applicable at a preliminary hearing. (*Harris*, *supra*, 37 Cal.4th at p. 336.)

## B.    *CSAAS Evidence and CALCRIM No. 1193*

### 1.    *CSAAS Testimony*

Rosas Mendoza next argues the trial court abused its discretion by admitting Carmichael's expert testimony on CSAAS. Rosas Mendoza does not dispute that CSAAS testimony is relevant to disabuse jurors of commonly held misconceptions about child sexual abuse victims' behavior but contends there were no myths or misconceptions to dispel in this case because there was no significant delay in reporting, and the victims "did not display unexpected behavior following the alleged abuse." We agree that A. Doe and B. Doe exhibited few of the " 'seemingly self-impeaching behavior[s]' " that the expert testimony may be admitted to counter. (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1301 (*McAlpin*); see also *People v. Patino* (1994) 26 Cal.App.4th 1737, 1744–1745 [CSAAS evidence is admissible "if the victim's credibility is placed in issue due to the[ir] paradoxical behavior, including a delay in reporting a molestation"].) They resisted Rosas Mendoza's groping, albeit discreetly; they not only complained of his conduct to each other and to peers but did so in rough contemporaneity with the abuse; and they reported the abuse to a responsible adult within days. And the defense did not challenge either sister's credibility based on their own conduct or statements: The defense theory was instead that the sisters misinterpreted Rosas Mendoza's intent in committing the acts constituting the abuse, not that those acts never happened. A trial court could thus reasonably conclude that neither A. Doe nor B. Doe exhibited paradoxical behavior that could not readily be understood by a lay jury without a CSAAS expert and thus exclude

15

the testimony as unnecessary unless and until the conduct of the defense gave it reason to reconsider that assessment.

But " 'we are not authorized to substitute our judgment for that of the trial judge; the trial court's exercise of discretion will not be disturbed in the absence of a clear showing of abuse.' " (*Jensen v. Superior Court* (2021) 64 Cal.App.5th 1003, 1012.)  We may not infer from a silent record that the trial court misread applicable law or failed to recognize and exercise its discretion in weighing the propriety of CSAAS testimony in the unique context of this case.  Nor can we say the record is *wholly* devoid of evidence from which an uninformed juror might question whether the behavior of A. Doe or B. Doe was inconsistent with their reported experience—evidence that Carmichael's testimony might help explain.  For example, B. Doe, the younger sister, testified that she twice pushed Rosas Mendoza away but ultimately endured more touching until he voluntarily left her alone.  She also acknowledged having omitted some material information in her initial statement to law enforcement, because "[she] didn't want to talk to them" and "was young and … nervous."  In this regard, a trial court could reasonably consider Carmichael's testimony about helplessness and delayed or inconsistent disclosure to be relevant and potentially helpful to dispel misconceptions about child victim behavior.  (*McAlpin*, *supra*, 53 Cal.3d at p. 1301; see also *People v. Bowker* (1988) 203 Cal.App.3d 385, 394 [CSAAS-type evidence admissible to show that "victim's reactions as demonstrated by the evidence are not inconsistent with having been molested"].)

Even assuming the trial court here only reflexively admitted Carmichael's CSAAS testimony without reasoned consideration of whether it would assist the jury, however, Rosas Mendoza has not shown that any such error "resulted in a miscarriage of justice." (Evid. Code, § 354.)  As we have explained, CSAAS testimony pertains to the reactions of child victims of abuse, not to the intent of the perpetrator—the crux of Rosas Mendoza's defense.  To the limited extent that Rosas Mendoza disputed specific acts

16

alleged by A. Doe and B. Doe, the evidence of those acts was compelling: Besides the sisters' unequivocal testimony, the jury heard the testimony of A. Doe's boyfriend and B. Doe's best friend about the sisters' complaints—made in real time—about Rosas Mendoza's acts. The jury also had documentation of the text messages in which the sisters made those contemporaneous and spontaneous statements to these third party witnesses and, in B. Doe's case, to her sister. And the jury heard from the sisters' mother and brother how promptly the sisters reported the abuse to them. On this record, Rosas Mendoza has not shown any reasonable probability of a more favorable verdict absent Carmichael's testimony.

## 2. *CALCRIM No. 1193*

Relatedly, Rosas Mendoza argues the trial court erred in instructing the jury on CALCRIM No. 1193. Rosas Mendoza specifically takes issue with the last phrase of the instruction, which permits the jury to consider Carmichael's CSAAS testimony "in deciding whether or not [A. Doe's] and/or [B. Doe's] conduct was not inconsistent with the conduct of someone who has been molested *and in evaluating the believability of the alleged victims*." Rosas Mendoza contends that the inclusion of the "believability of the … alleged [victims]" improperly allowed the jurors to use Carmichael's testimony to conclude that Rosas Mendoza sexually abused A. Doe and B. Doe, thereby reducing the prosecution's burden of proof and violating his constitutional rights. Reviewing the instruction de novo (*People v. Ramirez* (2023) 98 Cal.App.5th 175, 218 (*Ramirez*)), we consider it " 'in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner' " (*People v. Rivera* (2019) 7 Cal.5th 306, 326 (*Rivera*)).

Multiple appellate courts have upheld the language of CALCRIM No. 1193 as accurately informing the jury of what we have recognized as the limited use of CSAAS evidence to evaluate seemingly inconsistent behavior by alleged victims of child sexual abuse. (See, e.g., *Ramirez*, *supra*, 98 Cal.App.5th at p. 219; *People v. Ortiz* (2023)

17

96 Cal.App.5th 768, 816; *People v. Gonzales* (2017) 16 Cal.App.5th 494, 504 (*Gonzales*); *People v. Lapenias* (2021) 67 Cal.App.5th 162, 175–176.) But to the extent that CALCRIM No. 1193's further reference to the alleged victims' believability as a distinct purpose could be construed as implying a broader application, we consider it unlikely that the jury here would have applied the instruction in an impermissible manner. (*Rivera*, *supra*, 7 Cal.5th at p. 326.) CALCRIM No. 1193 told the jury that CSAAS evidence was not evidence that Rosas Mendoza committed the charged crimes. And Carmichael's own testimony was appropriately limited: He denied that CSAAS evidence can be used as a diagnostic tool, and he neither rendered an opinion on whether A. Doe or B. Doe were in fact molested nor suggested that the presence of behaviors matching CSAAS features warranted an inference of past abuse. The prosecutor in her closing argument appropriately limited the inferences she asked the jury to draw from Carmichael's testimony. Moreover, with so little behavior that could be construed as self-impeaching, contrasted with the wealth of evidence corroborating the sisters' real-time complaints to their peers, it is unlikely that the former would have been central to the jury's deliberations.

On this record, accordingly, CALCRIM No. 1193's reference to the believability of the victims would not in our view have led the jury to misapply CSAAS evidence as a diagnostic tool—to extrapolate from reactive behaviors of A. Doe or B. Doe that Rosas Mendoza had in fact abused them. For these same reasons, we find no merit in Rosas Mendoza's related claim that the instruction impermissibly lowered the prosecution's burden of proof. (*Gonzales*, *supra*, 16 Cal.App.5th at p. 504.)

C.    *Admission of Rebuttal Testimony*

Rosas Mendoza next argues the trial court should have excluded Arredondo's testimony under Evidence Code section 352. As part of the prosecution's rebuttal case, Arredondo testified that during a traffic stop, Rosas Mendoza falsely identified himself and provided false descriptions of the tattoos Arredondo attempted to use as identifying

18

marks.  Rosas Mendoza was also found to possess the personal identifying information of four other people.

Rosas Mendoza does not dispute that Arredondo's testimony was relevant to his credibility as a testifying witness.  " '[B]y taking the stand, defendant put his own credibility in issue and was subject to impeachment in the same manner as any other witness.' "  (*People v. Doolin* (2009) 45 Cal.4th 390, 438.)  The prosecutor was thus entitled to impeach that credibility " 'in the same manner as any other witness.' "  (*Ibid.*)  Rosas Mendoza argues, however, that the probative value of Arredondo's testimony was substantially outweighed by its prejudicial impact:  (1) The testimony regarding Rosa Mendoza's efforts to hide his identity suggested that he had "absconded, and would have continued to do so"; (2) his possession of others' personal identifying information was likely to be inflammatory "given how common and harmful [identify theft] offenses are"; and (3) Rosas Mendoza's "thug life" and "evil life" tattoos might cause the jury to believe he was living "a criminal lifestyle."

But " ' "prejudicial" is not synonymous with "damaging," ' " and the prejudice Evidence Code section 352 "is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence."  (*People v. Karis* (1988) 46 Cal.3d 612, 638.)  Rather, " '[t]he "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.' "  (*Ibid.*)  Such is not the case here:  While Rosas Mendoza is correct that Arredondo's testimony suggested that Rosas Mendoza had absconded, the fact is, Rosas Mendoza *had* absconded, remained at large for over a year, and gave no indication that he planned to turn himself in anytime soon.  Arredondo's testimony was thus not only relevant to impeaching Rosas Mendoza's credibility; it was admissible to show his consciousness of guilt.  (See *People v. Pettigrew* (2021) 62 Cal.App.5th 477, 497–498 [" ' "[a]*ny conduct*

of a defendant subsequent to the commission of the crime tending to show consciousness of guilt is relevant and admissible" ' "].)

Rosas Mendoza next contends that Arredondo's testimony insinuating that he was involved in identity theft was likely to be inflammatory to the jury. True, that portion of Arredondo's testimony did not paint Rosas Mendoza in the best light; but the testimony was limited and pales in comparison to the allegations of sexual abuse in this case. Nor did the court abuse its discretion in permitting limited testimony about Rosas Mendoza's misrepresentation about his tattoos for the purpose of undermining his character for honesty, and to impeach his prior testimony that he would not lie to police.[8] While Rosas Mendoza claims that this evidence might imply to the jury that he was living a "criminal lifestyle," the trial court's implicit determination that this evidence would not be unduly inflammatory in light of Rosas Mendoza's prior admission to having multiple convictions and open cases fell within its broad discretion.

## D.    *Allegation of Prosecutorial Misconduct*

Rosas Mendoza next argues that the prosecutor committed prejudicial misconduct by expressing her personal opinion regarding his guilt. During cross-examination, the prosecutor asked Rosas Mendoza whether they can agree that certain comments and behaviors are "disturbing and offensive." Rosas Mendoza agreed with the prosecutor that commenting on the bodies of his 13- and 16-year-old nieces would be disturbing and offensive, and that laying in the same bed as his 16-year-old niece would be "weird." Then, the following exchange ensued: "Q: … And then, would you agree that it's … offensive and disturbing if you said to a child 'No one else could have you. You're with me.' [¶] … [¶] The Defendant: --[L]ike I repeat myself, it did not happen in my situation. I don't remember doing that or even—know what I'm sayin'? So I— [¶] Q:

---

[8] The trial court could of course have admitted testimony about the inaccuracy of Rosas Mendoza's description of his tattoos while also sanitizing the testimony about the tattoos' actual wording. But the record reflects no request to so limit the testimony.

… Okay. Mr. Rosas Mendoza, listen to my question carefully. … [¶] I know you have a story to tell us, but I'm asking you not whether or not you said it but whether or not you would agree that that behavior is offensive and disturbing. [¶] A So just to clear up your—sorry; right? Just to clear it up, so what you're asking me is not an assuming thing that I did it, right? You're just asking me if I think it's weird, like what's my opinion, correct? [¶ Q: Yeah, because I already know you did it."

Rosas Mendoza contends that the prosecutor's statement, "I already know you did it," was an "unequivocal expression of the prosecutor's personal belief that [Rosas Mendoza] was guilty of the charged crimes," and suggested to the jury that the prosecutor had "more information at her disposal than what she presented at trial." As a preliminary matter, we agree with the Attorney General that this claim of prosecutorial misconduct is forfeited by Rosas Mendoza's failure to object and seek an admonition in the trial court.

" ' "As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety." ' " (*People v. Parker* (2022) 13 Cal.5th 1, 72.) Otherwise, a claim of prosecutorial misconduct "is reviewable only if an admonition would not have cured the harm caused by the misconduct." (*People v. Valdez* (2004) 32 Cal.4th 73, 122.) Here, defense counsel timely objected to the prosecutor's statement as "[a]rgumentative" and the trial court sustained the objection; but counsel did not further specify that he believed the prosecutor's comment to be misconduct, nor did he ask the court to admonish the jury to disregard the statement. And the record does not indicate that a timely admonition would have failed to cure the harm caused by the statement. (*Ibid.*)

But because Rosas Mendoza alternatively argues that the failure to preserve the claim denied him the effective assistance of counsel, we will exercise our discretion to reach the merits. (See *People v. Torres* (2025) 113 Cal.App.5th 88, 92.) We agree with Rosas Mendoza that the prosecutor's comment was improper: As the California Supreme

21

Court has cautioned, " 'prosecutors should refrain from expressing personal views which might unduly inflame the jury against the defendant.' " (*People v. Rowland* (1992) 4 Cal.4th 238, 281.) But we conclude that the prosecutor's error was not prejudicial.

" 'A prosecutor may not express a personal opinion or belief in the guilt of the accused when there is a substantial danger that the jury will view the comments as based on information other than evidence adduced at trial.' " (*People v. Lopez* (2008) 42 Cal.4th 960, 971.) "The danger that the jury will view the prosecutor's expressed belief in the defendant's guilt as being based on outside sources 'is acute when the prosecutor offers [her] opinion and does not explicitly state that it is based solely on inferences from the evidence at trial.' " (*Ibid.*) In this case, there was no "substantial danger" that the jury would consider the prosecutor's statement, "I already know you did it," to be "based on information extraneous to the evidence presented at trial." (*Ibid.*) Rather, the context would have made apparent to the jury that the prosecutor's remark was an intemperate and ill-conceived response to Rosas Mendoza's evasion of the prosecutor's questions. The risk that the jury would consider the gratuitous remark to be based on privileged access to extrarecord information was thus insubstantial. (*Ibid.*) It thus did not rise to the level of either a " ' " ' "deceptive or reprehensible method[] to attempt to persuade . . . the jury," ' " ' " or " ' " ' "a pattern of conduct … infect[ed] the trial with such unfairness as to make the conviction a denial of due process." ' " ' " (See *People v. Hill* (1998) 17 Cal.4th 800, 819 [setting forth applicable state and federal standards for prosecutorial misconduct].)

Finally, Rosas Mendoza argues the prosecutor's expression of personal belief in his guilt was exacerbated by her "vouching" for the victims during closing argument. Among other things, the prosecutor urged the jury to believe A. Doe because she lacked any motive to lie: "And let's be honest here, what does [A. Doe] get from being subpoenaed, being pulled from work, you know, not getting paid to go to work, having to sit here to talk about very, very sensitive topics, humiliating topics, in a room full of

22

strangers?  There's no prize here. There's no reason for her to make it up or testify falsely."  The prosecutor then argued that the jury should believe B. Doe because she also had no motive to lie, reiterating that "there is no prize for being a victim of sexual child molestation."

For support, Rosas Mendoza relies on *People v Rodriguez* (2020) 9 Cal.5th 474. There, the court held that the prosecutor's representation in closing argument that the testifying officers were telling the truth because they would not put their " 'entire career on the line' " constituted impermissible vouching because there was no evidence in the record to support the assertion.  (*Id*. at p. 481.)  But the *Rodriguez* court also clarified: "The prosecutor may ' "make 'assurances regarding the apparent honesty or reliability of' a witness 'based on the "facts of [the] record and the inferences reasonably drawn therefrom." ' " ' [Citation.]  The error here is that the prosecutor's arguments were based on matters outside the record."  (*Id.* at p. 483.)

The prosecutor's assertions that A. Doe had been "pulled from work" and was "not getting paid to go to work" were drawn from the record—A. Doe's testimony that she was missing work to testify and was "not happy" about it.  (*People v. Lamb* (2024) 16 Cal.5th 400, 440 [" '[S]o long as a prosecutor's assurances regarding the apparent honesty or reliability of prosecution witnesses are based on the "facts of [the] record and the inferences reasonably drawn therefrom …" [their] comments cannot be characterized as improper vouching' "].)  As for the prosecutor's argument that "there is no prize for [B. Doe] being a victim of sexual child molestation," there is no reasonable likelihood the jury would have understood the statement to be based on evidence outside the record so much as a sardonic understatement based on common sense.  We have no reason to question its propriety within the realm of "appropriate and zealous advocacy." (*Rodriguez*, *supra*, 9 Cal.5th at p. 483.)  Nor does it cast in a more nefarious light the prosecutor's prior retort to Rosas Mendoza.

**E.** *Sufficiency of the Evidence: Counts 2 and 3*

Finally, Rosas Mendoza challenges the sufficiency of the evidence supporting the jury's determination that he committed the acts underlying counts 2 and 3 and that he used force with B. Doe in doing so. We conclude that substantial evidence supports Rosas Mendoza's convictions on each count.

When considering a sufficiency of the evidence claim, we " 'review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value— from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Covarrubias* (2016) 1 Cal.5th 838, 890.) " 'Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence.' " (*People v. Grant* (2020) 57 Cal.App.5th 323, 330.) And "[w]e presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence." (*Covarrubias*, at p. 890.) But " '[a] reasonable inference may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guesswork.' " (*Grant*, at p. 330.)

To prove that Rosas Mendoza is guilty of a forcible lewd act against B. Doe, the prosecution must prove: (1) that Rosas Mendoza "willfully touched any part of [B. Doe's] body either on the bare skin or through the clothing," (2) that in committing the act, he "used force, duress, menace or fear of immediate and unlawful bodily injury to [B. Doe]," (3) that he "committed the act with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of himself or [B. Doe]," and (4) that "[B. Doe] was under the age of 14 years at the time of the act." (CALCRIM No. 1111.) On appeal, Rosas Mendoza disputes the sufficiency of the evidence only as to elements 1 and 2.

In the trial court, the prosecution specified that all three counts alleged as to B. Doe (counts 1–3) occurred on March 12, 2022—the night she stayed home from the

24

party. As to the willful touching requirement of element 1, the prosecution explained, "[F]or the sake of simplicity, I kind of designated three body parts [for the three counts]. One is the neck when he's kissing [B. Doe's] neck. One is the touching of her breast. And then the other is [the] rubbing of her thigh."

As to the force or duress element, the prosecution presented the jury with two alternative theories: First, the prosecution argued that Rosas Mendoza used force when he hugged B. Doe, moved her on to the bed, placed his hand on her neck, and lay down on top of her. "A 36-year-old man laying on top of a 13-year-old girl. That's force. That's the evidence of force." Second, the prosecutor argued that Rosas Mendoza used duress by telling B. Doe " [']he will not hurt her['] when he comes into the room. Which implies that he's capable of hurting her. And if things don't … go as planned, then maybe he would have hurt her." The prosecutor argued that this statement—considering B. Doe's young age, her relationship with Rosas Mendoza, and the fact that she was alone without her family in the house—satisfied the duress requirement.

### 1.    *Element 1: Willful Touching*

There is substantial evidence to support the jury's findings that Rosas Mendoza willfully touched B. Doe's thigh and breast.[9] A "lewd or lascivious act can occur through the victim's clothing and can involve 'any part' of the victim's body." (See *People v. Morales* (2018) 29 Cal.App.5th 471, 478 (*Morales*) [touching of victim in the "waist area" and "middle side of her thigh" met touching element of section 288].) Here, B. Doe testified that on the night she stayed home alone, Rosas Mendoza laid on top of her and kissed and squeezed her neck before sliding his hand down to her breast. She clarified that the touching of her breast "happened quickly" and that the hand Rosas Mendoza used slid "from [her] neck … through [her] breast, and then he took it off." She

---

[9] Rosas Mendoza does not dispute that sufficient evidence supports his conviction based on his forcible lewd touching of B. Doe's neck (count 1).

25

also testified that Rosas Mendoza put his hand on her thigh and moved his hand [f]rom "side to side." An investigating officer who interviewed B. Doe near the time of the incident confirmed that she told him Rosas Mendoza had "touched … and … rubb[ed] her thigh." This testimony provides an adequate basis for the jury to find a "willful[] touching" sufficient to satisfy element 1 of section 288, subdivision (b). (CALCRIM No. 1111.)

The asserted basis for Rosas Mendoza's challenge to his conviction for count 2 is that the trial court told the jury that count 2 related to a touching of B. Doe's "butt/hip," not her thigh. Rosas Mendoza's contention is based on the trial court's answer when the jury asked whether each of the counts involving B. Doe related to a specific body part. The court replied: "Count 1 relates to neck. Count 2 relates to butt/hip. Count 3 relates to breast." But because a lewd touching can involve "any part" of a victim's body, and because the prosecution's theory of the case made clear that count 2 pertained specifically to a touching of B. Doe's thigh, the trial court's inadvertent misstatement as to what count 2 entailed does not render the evidence insufficient.

### 2. *Force or Duress*

There is also substantial evidence that Rosas Mendoza used force or duress in committing the lewd touching alleged in counts 2 and 3. For purposes of section 288, subdivision (b)(1), the force used "must be substantially different from or substantially greater than the force needed to accomplish the act itself." (CALCRIM No. 1111.) " '[A]cts of grabbing, holding and restraining that occur in conjunction with the lewd acts themselves' are sufficient to support a finding that the lewd act was committed by means of force." (*Morales*, *supra*, 29 Cal.App.5th at p. 480.) Here, B. Doe testified that on the night of the incident, after she had moved from one mattress to another to get away from him, Rosas Mendoza got on top of her on the second mattress and "squeezed" her neck, before moving his hand from her neck to her breast, and then her thigh. Restraining a 13 year old with one's body weight while touching her breast and thigh constitutes force

26

"substantially different … than the force needed to accomplish the act itself." More so when pressure to the 13-year-old's neck is being applied.

Alternatively, there is substantial evidence that Rosas Mendoza committed the lewd touching by duress. "For purposes of section 288, subdivision (b), 'duress' means ' "a direct *or implied* threat of force, violence, danger, hardship or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to … acquiesce in an act to which one otherwise would not have submitted." ' " (*People v. Veale* (2008) 160 Cal.App.4th 40, 46, italics added.) " ' "The total circumstances, including the age of the victim, and [her] relationship to defendant are factors to be considered in appraising the existence of duress." ' " (*Ibid.*) B. Doe was 13 years old at the time of the incident, was unwell, and was alone at home with her then-34-year-old uncle. Rosas Mendoza came into her living space and immediately told her "he wouldn't do anything to hurt [her]," something he had never said before, and then proceeded to lay on top of her and touch her neck, breast, and thigh. A reasonable jury could infer, based on the totality of these circumstances and consistent with the prosecution's theory, that in making this statement, Rosas Mendoza was implying to her that he is capable of hurting her and would do so if she did not acquiesce in his actions.

Finally, Rosas Mendoza contends that even if he used force, there remains insufficient evidence that the force coincided with the lewd touching alleged in the disputed counts. We disagree. Viewing the evidence in the light most favorable to the judgment, a jury can reasonably infer from B. Doe's testimony that Rosas Mendoza touched her breast and thigh after laying on top of her on the mattress and squeezing her neck. And even accepting Rosas Mendoza's argument that the lewd touching preceded any use of force, there remains substantial evidence to support Rosas Mendoza's convictions for counts 2 and 3 under a duress theory, based on evidence that Rosas Mendoza told B. Doe he "wouldn't do anything to hurt [her]" upon entering the living room—before any touching had occurred.

Substantial evidence supports Rosas Mendoza's convictions for counts 2 and 3.

## III.    DISPOSITION

The judgment is affirmed.

_____

LIE, J.

WE CONCUR:

_____

GROVER, Acting P. J.

_____

WILSON, J.

*People v. Rosas Mendoza*
H052314